IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

January 2016 Term

No. 14-0919

**FILED**

**May 20, 2016**

released at 3:00 p.m.
RORY L. PERRY, II CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

STATE OF WEST VIRGINIA,
Plaintiff Below, Respondent

v.

DENNY FRANKLIN ERVIN,
Defendant Below, Petitioner

Appeal from the Circuit Court of Preston County
Honorable Lawrance S. Miller, Jr., Judge
Criminal Action No. 12-F-85

AFFIRMED

Submitted:  April 27, 2016
Filed:  May 20, 2016

Michael J. Sharley, Esq.
Westover, West Virginia
and
Richard M. Gutmann, Esq.
Morgantown, West Virginia
Attorneys for Petitioner

Patrick Morrisey, Esq.
Attorney General
Shannon Frederick Kiser, Esq.
Assistant Attorney General
Charleston, West Virginia
Attorneys for Respondent

JUSTICE LOUGHRY delivered the Opinion of the Court.

SYLLABUS BY THE COURT

1.    "In reviewing challenges to findings and rulings made by a circuit court, we apply a two-pronged deferential standard of review.  We review the rulings of the circuit court concerning a new trial and its conclusion as to the existence of reversible error under an abuse of discretion standard, and we review the circuit court's underlying factual findings under a clearly erroneous standard.  Questions of law are subject to a *de novo* review."  Syl. Pt. 3, *State v. Vance*, 207 W.Va. 640, 535 S.E.2d 484 (2000).

2.    "A motion for a jury view lies peculiarly within the discretion of the trial court, and, unless the denial of such view works probable injury to the moving party, the ruling will not be disturbed."  Syl. Pt. 1, *Collar v. McMullin*, 107 W.Va. 440, 148 S.E. 496 (1929).

3.    "The action of a trial court in admitting or excluding evidence in the exercise of its discretion will not be disturbed by the appellate court unless it appears that such action amounts to an abuse of discretion."  Syl. Pt. 10, *State v. Huffman*, 141 W.Va. 55, 87 S.E.2d 541 (1955).

4. "A trial court's evidentiary rulings, as well as its application of the Rules of Evidence, are subject to review under an abuse of discretion standard." Syl. Pt. 4, *State v. Rodoussakis*, 204 W.Va. 58, 511 S.E.2d 469 (1998).

5. "A jury verdict may not ordinarily be impeached based on matters that occur during the jury's deliberative process which matters relate to the manner or means the jury uses to arrive at its verdict." Syl. Pt. 1, *State v. Scotchel,* 168 W.Va. 545, 285 S.E.2d 384 (1981).

6. "'A motion for a new trial on the ground of the misconduct of a jury is addressed to the sound discretion of the court, which as a rule will not be disturbed on appeal where it appears that defendant was not injured by the misconduct or influence complained of. The question as to whether or not a juror has been subjected to improper influence affecting the verdict, is a fact primarily to be determined by the trial judge from the circumstances, which must be clear and convincing to require a new trial, proof of mere opportunity to influence the jury being insufficient.' Syllabus Point 7, *State v. Johnson*, 111 W.Va. 653, 164 S.E. 31 (1932)." Syl. Pt. 1, *State v. Sutphin*, 195 W.Va. 551, 466 S.E.2d 402 (1995).

7.     "Failure to make timely and proper objection to remarks of counsel made in the presence of the jury, during the trial of a case, constitutes a waiver of the right to raise the question thereafter either in the trial court or in the appellate court."  Syl. Pt. 6, *Yuncke v. Welker*, 128 W.Va. 299, 36 S.E.2d 410 (1945).

8.     "To trigger application of the 'plain error' doctrine, there must be (1) an error;  (2) that is plain;  (3) that affects substantial rights;  and (4) seriously affects the fairness, integrity, or public reputation of the judicial proceedings."  Syl. Pt. 7, *State v. Miller*, 194 W.Va. 3, 459 S.E.2d 114 (1995).

9.     "An attorney for the state may prosecute vigorously as long as he deals fairly with the accused; but he should not become a partisan, intent only on conviction.  And, it is a flagrant abuse of his position to refer, in his argument to the jury, to material facts outside the record, or not fairly deducible therefrom."  Syllabus, *State v. Moose*, 110 W.Va. 476, 158 S.E. 715 (1931).

LOUGHRY, Justice:

The petitioner, Denny Franklin Ervin, appeals the June 18, 2014, final order of the Circuit Court of Preston County denying his motion for judgment of acquittal or, alternatively, a new trial and sentencing him to life in prison for his jury conviction of murder in the first degree without a recommendation of mercy and a determinate sentence of five years in prison for his jury conviction of wanton endangerment. The circuit court ordered that the sentences be served consecutively.

In this appeal, the petitioner contends the circuit court committed reversible error by: (1) not permitting the jury to visit the site of the alleged offenses; (2) excluding testimony of one of his witnesses; (3) allowing the jury to consider evidence not presented at trial; (4) allowing the State to misrepresent evidence during closing argument; and (5) not requiring the State to provide a bill of particulars regarding the alleged use of a firearm. Upon consideration of parties' briefs and arguments, the submitted record, and the pertinent authorities, we find no reversible error. Accordingly, the final order of the circuit court is affirmed.

1

## I. Factual and Procedural Background

The petitioner was indicted by a Preston County grand jury on October 6, 2012. The indictment contained five counts: (1) first degree murder; (2) use of a firearm to commit murder; (3) stalking; (4) wanton endangerment involving the use of a firearm; and (5) domestic assault. It was alleged that all of the acts occurred on or about May 8, 2012,[1] and resulted in the death of Leslie Dawn Layman (hereinafter "Ms. Layman" or "victim").[2] The record indicates that the petitioner and the victim had an intimate relationship that ended sometime prior to May 8, 2012. The petitioner did not deny he shot the victim but asserted that he had done so in self-defense. Following a seven-day trial that included testimony from more than twenty-five witnesses, the jury returned a verdict on April 17, 2014, finding the petitioner guilty of first degree murder as charged in count one of the indictment and wanton endangerment involving a firearm as charged in count four of the indictment. The jury also found that the petitioner had committed first degree murder using a firearm as charged in count two of the indictment. The jury did not recommend mercy with regard to the first degree murder conviction.

---

[1]With respect to the charge of stalking, the indictment alleged that this offense was committed from June 2010 through May 2012.

[2]The alleged victims of the wanton endangerment and domestic assault offenses charged in counts four and five of the indictment were Ms. Layman's daughters, who arrived at the scene during the shooting.

The following summary of the testimony and evidence produced at trial has been gleaned from the trial court's "Opinion Order Following June 5, 2014 Hearing on Defendant's Post-Trial Motions."[3] That order indicates that the State's case began with the testimony of Alberta Curry, the victim's neighbor, who testified that she observed a white Subaru travel past the victim's home at approximately 7:30 p.m. on May 8, 2012. She watched the vehicle proceed further up the road and park out of the sight of the victim's residence. Ms. Curry further testified that a short time later, she heard gunfire, specifically, three shots and then one louder shot. Her husband, Roger Curry, testified that he observed the petitioner walking by his garage after the shooting.

The victim's daughters, Cecillia Layman and Sara Layman, testified that they heard gunfire as they exited their car after returning home on the evening of May 8, 2012. Cecillia Layman stated that the first shot sounded like it went right past them. As she observed her mother going up a trail toward a chicken coop, she heard her say, "Help. I love you guys, call the cops." Thereafter, Cecillia heard the petitioner say, "You're gonna die, mother f***er."

---

[3]The parties did not provide a complete trial transcript in the joint appendix submitted in this case.

The State also presented testimony from several witnesses whom the petitioner called immediately after he shot the victim. In particular, Don Spiker testified the petitioner called him after the shooting and then brought a white Subaru to Mr. Spiker's residence, stating he no longer needed the vehicle and that he was probably going to prison because he shot the "girl down the street." According to Mr. Spiker, the petitioner attempted to leave a pistol with him too, but he refused to accept it. The pistol was later found approximately fifty feet from the road near Mr. Spiker's garage according to the testimony of John Barnett of the Mountaineer Area Rescue Group, who assisted in the recovery of the weapon.

The petitioner's sister-in-law, Margaret Ervin, testified the petitioner called her and told her he was in "bad trouble" because he had shot Ms. Layman twice. Ms. Ervin stated that the petitioner seemed "normal" on the telephone and never mentioned anything about self-defense in shooting the victim. Mark Atkinson, a friend of the petitioner, testified that on the day of the shooting the petitioner told him he had sent a text message telling Ms. Layman he was going to kill her. Mr. Atkinson stated he believed at the time that the petitioner was just angry. Mr. Atkinson further testified the petitioner later left a message on his cellular phone indicating he had shot the victim twice but never mentioned anything regarding self-defense.

4

The petitioner's sister, Linda Soccorsi, testified she received a call from her brother sometime after 9:00 p.m. on the night of the shooting. She said the petitioner told her he had shot Ms. Layman twice and was going to jail for the rest of his life but gave no explanation as to why he shot the victim. According to the testimony of Tammy Belldina, the petitioner telephoned her and said he shot Ms. Layman twice, adding he was "tired of people messing with him."

The State's evidence also included voice mail messages left by the petitioner on the victim's home telephone answering machine between May 4, 2012, and May 8, 2012. The petitioner referred to the victim as a "whore" throughout the messages and mentioned a "new man" several times. He also accused Ms. Layman of cheating on him during their relationship.

To support his claim of self-defense, the petitioner called David McMasters as a witness during his case-in-chief. Mr. McMasters, who lives approximately fifty yards from the Layman residence, testified that he heard several gunshots between 8:20 p.m. and 8:30 p.m. on the night the victim was killed. He said he heard eight to ten .22 caliber shots followed by a single shot from a large-caliber shotgun. He further testified that after hearing

the gunshots, he observed Sara Layman drive down to her grandparents' nearby home. On cross-examination, Mr. McMasters testified that the large-caliber round sounded like it was shot at the ground.

The petitioner presented testimony from Robert White, a forensic chemist and an expert in the field of gunshot residue analysis. Mr. White testified that he worked for the West Virginia State Police Lab for thirty years, holding the position of director of the lab during his last three years of employment. After stating that a gunshot residue analysis was not performed on the victim, Mr. White voiced his disagreement with the current practice of the West Virginia State Police Lab not to test for gunshot residue on a victim. He opined that a gunshot residue analysis of the victim would have been probative given the circumstances of this case.[4]

The petitioner called Rebecca Turner as a witness. Ms. Turner works at a gas station in Masontown, West Virginia. She testified that the petitioner came into the station

_____

[4]The State presented testimony from the lead investigator, Former Lieutenant J. Stiles of the Preston County Sheriff's Department. He testified it was raining very hard the night the victim was killed and that a critical decision had to be made regarding whether to move the body out of the rain or leave it in place for the collection of evidence in the morning after the sun came up. Ultimately, the decision to move the body was made although the body had been exposed to heavy rain for some period of time before it was moved. In denying the petitioner's motion for acquittal based on alleged insufficiency of the evidence, the circuit court concluded that the exposure of the victim's body to rain may have affected the probative value of any gunshot residue analysis if such testing had been performed.

between 1:00 and 2:00 p.m. on May 8, 2012, and purchased a thirty-pack of Bud Light beer. According to Ms. Turner, the petitioner was in a "normal" mood.

The petitioner presented testimony from Chad Miller, who is married to the petitioner's niece. Mr. Miller testified that on the day of the shooting, he, his wife, and their five-year-old son picked up the petitioner in Masontown and traveled to Pennsylvania to get a part for his vehicle. He testified that the petitioner had argued with his son, upsetting his wife. On cross-examination, Mr. Miller testified it was like the petitioner had "flipped a switch." He also stated he told the police anything would "piss off" the petitioner.

The petitioner called Koren Powers as a telephonic witness.[5] Ms. Powers is the section supervisor of the trace evidence section at the West Virginia State Police Lab. Recognized by the trial court as an expert in forensic science, Ms. Powers testified that the lab's general policy is to recommend a gunshot residue kit be utilized on a shooting victim. Explaining further, she stated that the test is typically not performed at the lab because the victim has been in the environment of a gunshot, making the probative value of any analysis low. She added that the location of the victim in relation to the fired weapon and other

---

[5]By agreement of the parties, Ms. Powers was allowed to testify telephonically because she suffered from an illness and travel to Preston County would have been an imposition.

7

factors, such as the weapon's caliber and wind direction, affects whether there is gunshot residue on a victim. Ms. Powers testified no request was made to test Ms. Layman's t-shirt for gunshot residue.

The petitioner called Dr. James L. Frost, the former Deputy Chief Medical Examiner in West Virginia, to testify. Recognized by the trial court as an expert in forensic pathology, Dr. Frost testified he would always request an opportunity to inspect the victim's clothing for the presence of gunshot residue. He also testified, however, that rain may dilute or wash away gunshot residue. He stated that both bullet wounds sustained by Ms. Layman indicated a slight upward trajectory. Dr. Frost opined to a reasonable degree of medical certainty that Ms. Layman was first shot in the arm and then in the back.

The petitioner called two 911 operators to testify. The first, Jana Wolfe, received an emergency 911 call from Tammy Belldina on the night of shooting. Ms. Belldina reported the petitioner told her he shot Ms. Layman in the head and the back but did not know if she were dead. On cross-examination, Ms. Wolfe read the entirety of the Incident Detail Report generated from the call made by Ms. Belldina, which included Ms. Belldina's statement that the petitioner had told her he was "tired of taking people's sh*t."

Justin Wolfe testified he took an emergency 911 call from the victim on February 28, 2011, regarding a domestic violence incident between her and the petitioner. He relayed a statement made by Ms. Layman during the call that she would shoot the petitioner if he returned to her home. On cross-examination, the entirety of the Incident Detail Report was read to the jury. The report revealed that the petitioner had been threatening Ms. Layman and had entered her home, ripped off the back door of her trailer, hit her with a bucket, and spit in her face. He also cut the brakes on one of her vehicles during this incident.

The defendant chose not to testify at his trial. The jury deliberated for three hours before returning its verdict. During the deliberations, the jury asked to see the data or call log from the petitioner's cell phone and a video that had been obtained from another cell phone, which had been taken to the Digital Forensics Unit in August 2013. Although these items were mentioned during the trial, neither were admitted into evidence. Accordingly, the trial court advised the jury: "The Court has previously ruled that this evidence cannot be published to the jury."

Subsequent to the jury's return of guilty verdicts with regard to the charges of first degree murder and wanton endangerment, the petitioner filed a motion for judgment of acquittal or, alternatively, a new trial. The trial court held a hearing on the motions on June

9

5, 2014. The motions were denied in the sentencing order entered on June 18, 2014. This appeal followed.

## II. Standard of Review

The petitioner appeals the trial court's final order denying his post-conviction motion for judgment of acquittal[6] or, alternatively, a new trial. We have explained that

> [i]n reviewing challenges to findings and rulings made by a circuit court, we apply a two-pronged deferential standard of review. We review the rulings of the circuit court concerning a new trial and its conclusion as to the existence of reversible error under an abuse of discretion standard, and we review the circuit court's underlying factual findings under a clearly erroneous standard. Questions of law are subject to a *de novo* review.

Syl. Pt. 3, *State v. Vance*, 207 W.Va. 640, 535 S.E.2d 484 (2000). To the extent a more specific standard of review applies to a particular assignment of error, it will be set forth in the discussion that follows. Accordingly, we proceed to consider the parties' arguments.

## III. Discussion

The petitioner's five assignments of error will be addressed separately below.

---

[6]While the petitioner challenged the sufficiency of the evidence produced at trial, resulting in his convictions of first degree murder and wanton endangerment, he did not raise that issue in this appeal.

10

## A. Request for Jury View

The petitioner first contends the trial court erred by denying his motion for a jury visit to the site where the shooting occurred.[7] The petitioner contends the jury should have been allowed to view the victim's mobile home in relation to the location of Roger Curry's residence; Mark Atkinson's residence; the chicken coop; the brush/tree line; an abandoned home; the area where the petitioner parked the Subaru; the homes of other State witnesses; and the road leading to the victim's parents' home. The petitioner contends visiting the site would have allowed the jury to get a sense of the crime scene. The trial occurred in April and was close to the time of year –May–when the shooting occurred. The petitioner acknowledges the vegetation might have been slightly different but contends that

---

[7]West Virginia Code § 56-6-17 (2012) provides:

> The jury may, in any case, at the request of either party, be taken to view the premises or place in question, or any property, matter or thing relating to the controversy between the parties, when it shall appear to the court that such view is necessary to a just decision, and in such case the judge presiding at the trial may go with the jury and control the proceedings; and in a felony case the judge and the clerk shall go with the jury and the judge shall control the proceedings, and the accused shall likewise be taken with the jury or, if under recognizance, shall attend the view and his recognizance shall be construed to require such attendance. The party making the motion, in a civil case, shall advance a sum sufficient to defray the expenses of the jury and the officers who attend them in taking the view, which expenses shall be afterwards taxed like other legal costs.

11

overall there was not a significant change in the area since the shooting occurred. The petitioner maintains that where self-defense is asserted, it is important for the jury to know the "lay of the land" where the incident occurred.

Conversely, the State contends the trial court did not abuse its discretion in refusing the petitioner's motion. Noting there were numerous photographs, charts, and aerial shots that allowed the jury to visualize the scene of the crime, the State asserts the petitioner simply failed to set forth a legitimate purpose for a jury view of the site of the alleged offenses.

This Court has long held that "[a] motion for a jury view lies peculiarly within the discretion of the trial court, and, unless the denial of such view works probable injury to the moving party, the ruling will not be disturbed." Syl. Pt. 1, *Collar v. McMullin*, 107 W.Va. 440, 148 S.E. 496 (1929). Here, the record reflects the circuit court denied the petitioner's motion because the parties agreed prior to trial that the scene was no longer as it was on the night of the shooting due to the removal of some vehicles that might be of issue and the absence of foliage that would have been there when the shooting occurred.[8] The

---

[8]The petitioner was appointed new counsel to handle all post-conviction matters after the trial court entered the sentencing order. While the record indicates the petitioner's trial counsel acknowledged prior to trial that the site of the offenses had changed since the shooting because of the removal of certain vehicles, the petitioner's appellate counsel maintains the site was sufficiently similar to have warranted a jury visit.

court also considered the fact that the location of the shooting was thirty minutes from the courthouse and there were numerous photos and other documents available to present at trial to allow the jury to visualize the scene of the alleged offenses. Given these facts and the broad discretion afforded to the trial court on this issue, we conclude there is no merit to this assignment of error.

## B. Exclusion of Witness Testimony

The petitioner next asserts the trial court erred by refusing to allow his witness, Lisa McCartney, to testify regarding a statement made to her by the victim. Prior to trial, the petitioner filed a motion in limine explaining that

> [t]he victim's best friend, Lisa McCartney[,] was interviewed by the police in this case and Ms. McCartney told the police that Ms. Layman, at one time, had "met [the petitioner] at the door with a shotgun["], and "she backed him out of the door," and that she had "fired a warning shot" at him.

Seeking to use the victim's statement to Ms. McCartney about this incident to support his claim of self defense, the petitioner argued during the proceedings below that this evidence was admissible as a statement against interest pursuant to Rule 804(b)(3) of the West Virginia Rules of Evidence.[9] He now contends in this appeal that the evidence was

---

[9]Rule 804(b)(3) provides an exception to the hearsay rule for a statement against interest which is defined as a statement that

> (A) a reasonable person in the declarant's position would have made only if the person believed it to be true because,

13

admissible as a statement of a party opponent under Rule 801(d)(2) of the West Virginia Rules of Evidence.[10] The State maintains, however, that the trial court did not err in concluding this evidence was inadmissible hearsay.

It is well settled that "[t]he action of a trial court in admitting or excluding evidence in the exercise of its discretion will not be disturbed by the appellate court unless

when made, it was so contrary to the declarant's proprietary or pecuniary interest or had so great a tendency to invalidate the declarant's claim against someone else or to expose the declarant to civil or criminal liability; and
    (B) is supported by corroborating circumstances that clearly indicate its trustworthiness, if it is offered in a criminal case as one that tends to expose the declarant to criminal liability.

[10] Rule 801(d)(2) of the West Virginia Rules of Evidence provides that a statement offered against an opposing party is not hearsay if that statement:

    (A) was made by the party in an individual or representative capacity;
    (B) is one the party manifested that it adopted or believed to be true;
    (C) was made by a person whom the party authorized to make a statement on the subject;
    (D) was made by the party's agent or employee on a matter within the scope of that relationship and while it existed; or
    (E) was made by the party's coconspirator during and in furtherance of the conspiracy.

The statement must be considered but does not by itself establish the declarant's authority under (C); the existence or scope of the relationship under (D); or the existence of the conspiracy or participation in it under (E).

14

it appears that such action amounts to an abuse of discretion." Syl. Pt. 10, *State v. Huffman*, 141 W.Va. 55, 87 S.E.2d 541 (1955). In other words, "a trial court's evidentiary rulings, as well as its application of the Rules of Evidence, are subject to review under an abuse of discretion standard." Syl. Pt. 4, *State v. Rodoussakis*, 204 W.Va. 58, 511 S.E.2d 469 (1998). As noted above, the petitioner argues in this appeal that Ms. Layman's statement to Ms. McCartney should have been admitted into evidence by the trial court as a party admission pursuant to Rule 801(d)(2) of the West Virginia Rules of Evidence. However, Ms. Layman is not a party in this case; she is the victim. The parties in this case are the petitioner and the State of West Virginia. Accordingly, the statement is not a party admission.

The record shows the trial court ruled that this evidence was classic hearsay, which was not admissible as a present sense impression, excited utterance, or then existing state of mind because the statement was allegedly made to Ms. McCartney some time after the incident occurred.[11] The trial court rejected the petitioner's contention that the victim's statement to Ms. McCartney constituted a statement against interest. In that regard, the petitioner asserted Ms. Layman exposed herself to criminal prosecution for wanton endangerment by telling Ms. McCartney that she forced the petitioner from her home with a shotgun and then fired a warning shot at him.

---

[11]*See* W.Va.R.Evid. 803 (providing exceptions to the hearsay rule).

The trial court noted that the test to be applied under Rule 804(b)(3) is whether a reasonable person would have thought the statement was against his or her interest when it was made. 2 Franklin D. Cleckley, *Handbook on Evidence for West Virginia Lawyers*, § 804.04[4] (6th ed. 2015). The reliability of this type of statement is founded on the belief the declarant would not have made the statement unless it was true, because "when made, it was so contrary to the declarant's proprietary or pecunitary interest or had so great a tendency to invalidate the declarant's claim against someone else or to expose the declarant to civil or criminal liability." *Id.*

The trial court found that Ms. Layman would not have thought her statement would expose her to criminal culpability given the circumstances. As the trial court explained, this statement was made by the victim to her best friend, someone whom she likely felt safe confiding in and, therefore, she would not have believed that criminal charges might result from her disclosure. The trial court also pointed out that during the incident, the petitioner hit Ms. Layman with a bucket, spit in her face, and cut the brakes on one of her vehicles; thus, it was not reasonably clear that Ms. Layman's actions toward the petitioner were criminal because case law permits the occupant of a dwelling to use deadly force when threatened by an intruder with serious bodily injury or death. *See* Syl. Pt. 2, *State v. W.J.B.*, 166 W.Va. 602, 276 S.E.2d 550 (1981) ("The occupant of a dwelling is not limited in using deadly force against an unlawful intruder to the situation where the occupant is threatened

16

with serious bodily injury or death, but he may use deadly force if the unlawful intruder threatens imminent physical violence or the commission of a felony and the occupant reasonably believes deadly force is necessary."). Accordingly, the trial court concluded that Ms. Layman's statement to Ms. McCartney was not sufficiently reliable to fall under the exception set forth in Rule 803(b)(3). The trial court further noted the petitioner was able to introduce the same evidence through a non-testimonial, excited utterance made by the victim to Justin Wolfe, the 911 operator. Mr. Wolfe testified about the same incident, revealing to the jury that Ms. Layman said she would shoot the petitioner if he were to come back to her home.

Upon review, we find no error in the trial court's decision to exclude Ms. McCartney's testimony regarding the statement made to her by the victim. As the trial court noted, the jury was aware of the threats made by the victim against the petitioner, and the jury, as the fact finder, chose not to believe the petitioner had acted in self-defense. In sum, we find no merit to this assignment of error.

### C. Alleged Juror Misconduct

The petitioner next asserts that the jury considered evidence not presented at trial in reaching its verdict. Prior to trial, the petitioner filed a motion to exclude two items from evidence: his cell phone call log and a video obtained from another cell phone

17

belonging to a female.[12] The State did not oppose the petitioner's motion, indicating it had not planned to offer this evidence during its case-in-chief, but might seek to introduce the video should the petitioner open the door to his character during trial.

At trial, during the testimony of Lieutenant Kenneth Wotring of the Preston County Sheriff's Department, the State asked if a cell phone, other than the petitioner's cell phone, was taken to the Digital Forensics Unit. Lieutenant Wotring answered affirmatively, stating that a female had called and told him she had received a video on her cell phone pertaining to the petitioner. Lieutenant Wotring further stated he met this female at the Digital Forensics Unit to obtain the video from her phone. Counsel for the petitioner objected to this testimony. Although Lieutenant Wotring testified that the State Police extracted a video from the cell phone, the video was not admitted into evidence at trial. Nonetheless, the jury requested to see both the video and the petitioner's cell phone call log during deliberations. With consent of counsel, the trial court informed the jury it had already ruled that this evidence could not be published to the jury. Relying upon this Court's decision in *State v. Scotchel*, 168 W.Va. 545, 285 S.E.2d 384 (1981), the petitioner argues

_____

[12]This female is not identified in the record before this Court; neither have we been apprised of the content of the video at issue.

18

the jury's verdict must be reversed because the jury's decision was based, at least in part, on the existence of this video. Conversely, the State maintains there is no evidence that the jury considered matters not presented at trial.

In *Scotchel*, the defendant challenged his assault and battery conviction based on the trial court's refusal to overturn the jury's verdict after a juror stated by affidavit that she had voted for conviction because another juror represented that the maximum penalty for the charged offense was a fine. The juror also stated she had been verbally abused by her fellow jurors and felt pressured to vote for a conviction because another juror appeared to be ill during deliberations. As this Court recognized in *Scotchel*, "a jury verdict may be impeached for matters of misconduct extrinsic to the jury's deliberative process." *Id.* at 545, 285 S.E.2d at 385, syl. pt. 2, in part. Upon review, this Court concluded the matters at issue were intrinsic to the jury's deliberative process. Denying the defendant relief, we held in *Scotchel* that "a jury verdict may not ordinarily be impeached based on matters that occur during the jury's deliberative process which matters relate to the manner or means the jury uses to arrive at its verdict." *Id.* at 545, 285 S.E.2d at 385, syl. pt. 1.

In the case sub judice, the circuit court determined there was no basis to conclude that the jury either considered inadmissable or unadmitted evidence or failed to consider the evidence introduced at trial. As the circuit court explained,

19

[T]here is no evidence presented by the [petitioner] that the jury considered the content of the video on the iPhone. Instead, the jury merely requested to see it, which request was refused by the Court after consultation with counsel and the [petitioner]. Although this particular scenario does not fall squarely within the examples provided in *Scotchel*, the Court considers this a "matter inherent in the jury's deliberative process." The jury had heard testimony that a video on the iPhone was retrieved by the Digital Forensics Unit, but were not shown the video based upon a prior motion *in limine,* and then asked to see it during deliberations. No showing has been made that the jury otherwise saw it or relied on it during their deliberations. Accordingly, this ground for a new trial is without merit.

This Court has held:

"A motion for a new trial on the ground of the misconduct of a jury is addressed to the sound discretion of the court, which as a rule will not be disturbed on appeal where it appears that defendant was not injured by the misconduct or influence complained of. The question as to whether or not a juror has been subjected to improper influence affecting the verdict, is a fact primarily to be determined by the trial judge from the circumstances, which must be clear and convincing to require a new trial, proof of mere opportunity to influence the jury being insufficient." Syllabus Point 7, *State v. Johnson*, 111 W.Va. 653, 164 S.E. 31 (1932).

Syl. Pt. 1, *State v. Sutphin*, 195 W.Va. 551, 466 S.E.2d 402 (1995).

In this case, there is simply no evidence the jury engaged in any misconduct. The fact that the jury asked to view the video does not indicate its existence played a role in the jury's decision. Moreover, even if the existence of the video was considered by the

jury in reaching its decision, absent evidence the jury was somehow able to view the video, it is a matter intrinsic to the deliberative process.  Consequently, we find no merit to this assignment of error.

### D.  Prosecutor's Closing Argument

The defendant next contends the circuit court erred by allowing the State to misrepresent evidence during its closing argument.  Specifically, the petitioner argues that prosecutorial misconduct occurred when the prosecutor, while discussing a series of phone messages left by the petitioner on Ms. Layman's voice mail, told the jury,

> He [referring to petitioner] says "I'll slay you."  Now, Mr. Tipton [petitioner's trial counsel] might argue that he's actually said, "I'll show you" there.  And that is a question of fact for you to decide.  I can't tell you what he said.  But what would be the difference?

Through these comments, the petitioner asserts the prosecutor wanted the jury to think that the petitioner intended to "slay" Ms. Layman when he went to her house.  By inserting statements not in evidence to bolster his case of premeditated murder, the petitioner maintains the prosecutor's comments prevented him from receiving a fair trial.

In response, the State points out that the petitioner made no objection to the prosecutor's remarks at trial and asserts that the only avenue for relief on this issue is by

21

application of the plain error doctrine. The State maintains that under such an analysis, there was simply no error. We agree.

This Court has held that "[f]ailure to make timely and proper objection to remarks of counsel made in the presence of the jury, during the trial of a case, constitutes a waiver of the right to raise the question thereafter either in the trial court or in the appellate court." Syl. Pt. 6, *Yuncke v. Welker*, 128 W.Va. 299, 36 S.E.2d 410 (1945). Because the petitioner's counsel did not object to the prosecutor's remarks, any error is foreclosed from our review unless it rises to the level of plain error. "To trigger application of the 'plain error' doctrine, there must be (1) an error; (2) that is plain; (3) that affects substantial rights; and (4) seriously affects the fairness, integrity, or public reputation of the judicial proceedings." Syl. Pt. 7, *State v. Miller*, 194 W.Va. 3, 459 S.E.2d 114 (1995). Upon review, we find the prosecutor was simply invoking his power to vigorously prosecute the State's case. As we have explained,

> An attorney for the state may prosecute vigorously as long as he deals fairly with the accused; but he should not become a partisan, intent only on conviction. And, it is a flagrant abuse of his position to refer, in his argument to the jury, to material facts outside the record, or not fairly deducible therefrom.

Syllabus, *State v. Moose*, 110 W.Va. 476, 158 S.E. 715 (1931). In this instance, the prosecutor merely pointed out two possible interpretations of a statement made by the

22

petitioner on the victim's answering machine and reminded the jury that it had to decide what the petitioner said. We do not find that these remarks constitute plain error. Accordingly, we find no merit to the petitioner's argument.

## V. Failure to Provide a Bill of Particulars

The petitioner's last assignment of error is that he was prejudiced by the prosecutor's failure to provide a bill of particulars regarding the alleged use of a firearm. According to the petitioner, his motion for a bill of particulars was granted by the trial court; however, the State failed to provide him with a bill of particulars throughout his trial. The petitioner claims he needed more detail from the State regarding the alleged use of a firearm and how such use violated the law. The petitioner further contends discovery was incomplete under Rule 7(f) of the West Virginia Rules of Criminal Procedure[13] because he never received the bill of particulars and, therefore, he was not provided a fair trial. The State maintains the petitioner was fully informed of the nature of the charges against him by the

---

[13]Rule 7(f) of the West Virginia Rules of Criminal Procedure provides:

> *Bill of particulars.* – The court may direct the filing of a bill of particulars. A motion for a bill of particulars shall be made pursuant to the provisions of Rule 12(b)(4) or at such later time as the court may permit. A bill of particulars may be amended at any time subject to such conditions as justice requires.

23

indictment and, therefore, the fact that the petitioner did not receive a bill of particulars does not constitute reversible error.

This Court has long recognized "[i]t is fundamental that the accused must be fully and plainly informed of the character and cause of the accusation. The Constitution so requires. . . . A bill of particulars is for the purpose of furnishing details omitted from the accusation or indictment, to which the defendant is entitled before trial." *State v. Counts*, 90 W.Va. 338, 342, 110 S.E. 812, 814 (1922). In this case, count two of the indictment charged the petitioner with "unlawfully, knowingly and feloniously commit[ting] the felony charged in Count 1 [First Degree Murder] by the use, presentment or brandishment of a firearm, in violation of West Virginia Code §§ 62-12-1 and 62-12-13, as amended, against the peace and dignity of the State." Count four of the indictment charged that the petitioner

> committed the criminal offense of "Wanton Endangerment Involving a Firearm" by feloniously and wantonly performing an act with a firearm which created a substantial risk of death or serious bodily injury, to wit: prior to matters otherwise alleged herein, Denny Franklin Ervin discharged a firearm in a threatening manner and in close proximity to the daughters of Leslie Dawn Layman, in violation of West Virginia Code § 61-7-12, as amended, against the peace and dignity of the State.

Upon review, we find the indictment fully informed the petitioner of the charges against him.[14] The indictment provided details as to the nature of the allegations with respect to how

---

[14]It was also asserted in count five of the indictment that the petitioner discharged a firearm during the commission of domestic assault. However, the petitioner was not

24

the firearm was used to commit the alleged offenses and identified the victims of those offenses. The petitioner has presented no evidence that the State's failure to provide a bill of particulars deprived him of exculpatory material or impaired his cross-examination of witnesses.

> While we have previously indicated that "we are unanimously of the opinion that the proper way to try a criminal case is to be responsive to all reasonable defense requests," *State v. Sette*, 167 W.Va. 385[, 397] 242 S.E.2d 464, 472 (1978), we have also held that, absent a showing that lack of discovery was prejudicial there is no reversible error, *Wilhelm v. Whyte*, W.Va., 239 S.E.2d 735, 739 (1977).

*State v. White*, 167 W.Va. 374, 384-85, 280 S.E.2d 114, 121-22 (1981). Accordingly, we find no merit to this assignment of error.

## IV. Conclusion

For the reasons set forth above, we find no reversible error. Therefore, the final order of the Circuit Court of Preston County entered on June 18, 2014, is affirmed.

Affirmed.

---

convicted of this offense.