# STATE OF WEST VIRGINIA
## SUPREME COURT OF APPEALS

**State of West Virginia,**
**Plaintiff Below, Respondent**

**vs)  No. 17-1041** (Randolph County 16-F-59)

**Nathaniel Ray Wegman,**
**Defendant Below, Petitioner**

**FILED**

**June 7, 2019**

EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

## MEMORANDUM DECISION

Petitioner Nathaniel Ray Wegman, by counsel Brian W. Bailey and Steven B. Nanners, appeals the November 3, 2017, order sentencing him for his convictions of attempted first-degree murder under West Virginia § 61-11-8(1); malicious assault on a government representative under West Virginia Code § 61-2-10b; and misdemeanor fleeing under West Virginia Code § 61-5-17(d). The State of West Virginia, by counsel Benjamin F. Yancey, III, filed a response in support of the circuit court's order.

This Court has considered the parties' briefs and the record on appeal. The facts and legal arguments are adequately presented, and the decisional process would not be significantly aided by oral argument. Upon consideration of the standard of review, the Court finds no substantial question of law and no prejudicial error. For these reasons, a memorandum decision affirming the circuit court's order is appropriate under Rule 21 of the Rules of Appellate Procedure.

In 2016 petitioner was indicted on the three counts set forth above. The charges arose from petitioner's attack on State Trooper J.J. Cornelius in a creek in Randolph County.

Pretrial, the circuit court denied petitioner's motion for a jury view of the crime scene.

Petitioner's two-day trial commenced on July 12, 2017. The State called the victim, Trooper Cornelius (the "trooper"), who testified as follows: On March 16, 2016, the trooper attempted to apprehend petitioner on a fugitive from justice warrant from Indiana, and to question petitioner regarding a local investigation on another matter. The trooper found petitioner at a trailer in Beverly, identified himself, told petitioner about the warrant for petitioner's arrest, and said he was going to transport petitioner to the police station. Petitioner ran out of the trailer toward Mill Creek, about 200 feet away. The trooper followed petitioner and yelled for him to stop. The trooper followed petitioner into the creek, which was about eighteen inches deep with a very swift current. The trooper grabbed petitioner by the shirt. Petitioner spun around, put the trooper in a "headlock," and both men fell into the creek due to petitioner's actions. When the trooper fell, he hit his head on the rocks, which disoriented him. Petitioner pinned the trooper's face under the water. Petitioner was partially laying on the trooper and the trooper's chest was pinned against the rocks on the creek base. The trooper "was losing oxygen fast" and "wasn't able to get a breath." The trooper

1

managed to push himself out of the water and catch one breath before petitioner again shoved him back under the water and held him there. The trooper was getting very weak; he felt he was drowning and believed petitioner was going to kill him. The trooper could not reach his service revolver because it was pinned under his body. The trooper was able to pull his service knife out of his pocket and open it with one hand. He "poked" petitioner in the side with the knife, but petitioner continued to hold him under the water. The trooper stabbed petitioner's left side and, even though petitioner's arm was still around his neck, the trooper started to come up out of the water. The trooper then cut petitioner's face and petitioner let him go. At that point, the trooper's head was out of the water, but he was "extremely weak." The trooper floated about twenty feet downstream. With just his head and arm above water, the trooper pulled his service revolver on petitioner, but he did not fire as he was so weak he could hardly hold the revolver. The trooper looked away because he heard someone calling out. When he looked back, he saw petitioner running away.

The State's next witness was Joseph Austin who lives near Mill Creek. Mr. Austin testified as follows: Mr. Austin arrived at the creek and saw the trooper lying in the creek with his head bobbing in and out of the water. The trooper had one hand around a rock and the other hand holding a gun pointed at petitioner. Mr. Austin called out to the trooper and asked if the trooper needed help. Mr. Austin entered the creek to assist the trooper. The water in the creek was about knee deep and the current almost knocked him off his feet. Mr. Austin carried the trooper out of the water and, as he did, saw petitioner walking away. The trooper was losing consciousness, so Mr. Austin called 911. Additional troopers and an ambulance arrived at the scene.

Other police officers testified as follows: Petitioner was captured later that day. Petitioner had stab wounds primarily to his abdomen and chin, and had lost considerable blood by the time the police found him in the woods. The police arrested petitioner and read him his *Miranda*[1] rights. Petitioner was taken by helicopter to a hospital, where he received thirty to forty stitches for his stab wounds, but he was released from the hospital the next day.

During their deliberations, the jury sent a question to the circuit court asking for the definition of attempted first-degree murder. The parties agreed that the court would re-read Instruction No. 1 to the jury that contained the statutory definition of attempted first-degree murder found in West Virginia Code § 61-11-8 (the attempt statute) and § 61-2-1 (the statute defining first-degree murder). Thereafter, the jury found petitioner guilty on all three counts.

On November 3, 2017, the circuit court sentenced petitioner to (1) not less than three nor more that fifteen years in prison for his attempted first-degree murder conviction; (2) not less than three nor more that fifteen years in prison for his malicious assault against a government representative conviction; and (3) twelve months for his misdemeanor conviction for fleeing from an officer on foot. The court ordered that the three sentences run consecutively.

Petitioner now appeals and raises six assignments of error. Petitioner first argues that the circuit court erred in failing to give his proposed jury instruction that would have allowed the jury to consider the lesser-included "attempt" offenses under West Virginia Code § 61-11-8, and either

---

[1] *See Miranda v. Arizona*, 384 U.S. 436 (1966).

an "unlawful assault" or "battery" under West Virginia Code § 61-2-10b, as opposed to "malicious assault" as defined in that same section.

"As a general rule, the refusal to give a requested jury instruction is reviewed for an abuse of discretion." Syl. Pt. 1, in part, *State v. Shingleton*, 222 W. Va. 647, 671 S.E.2d 478 (2008) (quoting Syl. Pt. 1, *State v. Hinkle*, 200 W. Va. 280, 489 S.E.2d 257 (1996)).

> A trial court's instructions to the jury must be a correct statement of the law and supported by the evidence. Jury instructions are reviewed by determining whether the charge, reviewed as a whole, sufficiently instructed the jury so they understood the issues involved and were not mislead by the law. A jury instruction cannot be dissected on appeal; instead, the entire instruction is looked at when determining its accuracy. A trial court, therefore, has broad discretion in formulating its charge to the jury, so long as the charge accurately reflects the law. Deference is given to a trial court's discretion concerning the specific wording of the instruction, and the precise extent and character of any specific instruction will be reviewed only for an abuse of discretion.

Syl. Pt. 4, *State v. Guthrie*, 194 W. Va. 657, 461 S.E.2d 163 (1995).

The circuit court denied petitioner's proposed "lessor included" jury instruction that set out the differences between "attempted first-degree murder" and "attempted second-degree murder," and also denied his proposed jury instructions on the lesser-included offenses of "assault [as opposed to malicious assault] of a governmental representative" and "battery of a governmental representative." Petitioner argues that the circuit court's refusal to instruct the jury on these lesser-included offenses was error because it effectively gave the jury an "all or nothing" choice: conviction or acquittal. Petitioner avers this was particularly problematic where only petitioner and the trooper witnessed the entire event, and Mr. Austin saw only the aftermath and, according to petitioner, had credibility problems.

Petitioner also claims that an attempted second-degree murder instruction was necessary because (1) the evidence pointed toward a very brief, heat-of-passion, confrontation between petitioner and the trooper; and (2) the sentence for attempted murder in the first-degree is three to fifteen years in prison while the sentence for attempted murder in the second-degree is only one to three years in prison. As for petitioner's proposed instruction regarding "assault of a governmental representative" and "battery of a governmental representative," he maintains they were proper because the jury could have interpreted the evidence as proving those crimes, particularly where the trooper's injuries were superficial. Petitioner notes that, at trial, his counsel asked the trooper: "[T]he hospital showed you had no concussion or anything more significant than scrapes and the contusion on your head, correct?" The trooper replied, "It-it said something like, head injury and things like that, I was not diagnosed with concussion that I can recall." The trooper also admitted that the entire event "[w]as a blur."

Finally, petitioner asserts that the attempted first-degree murder instruction clearly confused the jury given that it asked for the definition of attempted first-degree murder during its deliberations. Petitioner opines that the jury's question implies that the jurors were contemplating

3

a lesser-included offense.

Petitioner cites to no location in the record on appeal where he requested an attempted second-degree murder instruction. "Ordinarily, a party must raise his or her objection contemporaneously with the trial court's ruling to which it relates or be forever barred from asserting that that ruling was in error." *State v. Whittaker*, 221 W. Va. 117, 131, 650 S.E.2d 216, 230 (2007); *see also* W.Va.R.App.P. 10(c)(7). However, even if petitioner had not waived this issue,

> [t]he question of whether a defendant is entitled to an instruction on a lesser included offense involves a two-part inquiry. The first inquiry is a legal one having to do with whether the lesser offense is by virtue of its legal elements or definition included in the greater offense. The second inquiry is a factual one which involves a determination by the trial court of whether there is evidence which would tend to prove such lesser included offense.

Syl. Pt. 3, *State v. Wilkerson*, 230 W. Va. 366, 738 S.E.2d 32 (2013)(citations omitted).

Attempted second-degree murder is clearly a lesser-included offense of attempted first-degree murder and, factually, there is no question that this case regards a brief confrontation. However, "[a]ny interval of time between the forming of the intent to kill and the execution of that intent, which is of sufficient duration for the accused to be fully conscious of what he intended, is sufficient to support a conviction for first degree murder." Syl. Pt. 6, in part, *State v. Guthrie*, 194 W. Va. 657, 461 S.E.2d 163 (1995). Moreover, "[t]he difference between first- and second-degree murder is whether the homicide was willful, deliberate, and premeditated." *State v. Ferguson*, 165 W. Va. 529, 534, 270 S.E.2d 166, 170 (1980). Here, the evidence supports the finding that petitioner willfully, deliberately, and premeditatedly attempted to kill the trooper by drowning him as proved by the fact that petitioner caused the trooper to be facedown under water and then forcibly held him there. The evidence also shows that when the trooper was able to rise up and catch a breath, petitioner pushed him back under the water and then put his full weight on the trooper to keep him under the water. Petitioner did not let go of the trooper until the trooper stabbed him multiple times. "[I]f one voluntarily does an act, the direct and natural tendency of which is to destroy another's life, it fairly may be inferred, in the absence of evidence to the contrary, that the destruction of that other's life was intended." *State v. LaRock*, 196 W. Va. 294, 305, 470 S.E.2d 613, 624 (1996).

As for petitioner's statement that the sentence for attempted second-degree murder is less severe than that for attempted first-degree murder, sentence length is not a factor in *Wilkerson's* two-part test for determining whether a defendant is entitled to a lesser-included offense instruction. As for petitioner's claim that the jury was likely contemplating a lesser-included offense because it asked for the definition of first-degree murder during deliberations, we find that claim to be mere conjecture.

The circuit court also properly denied petitioner's proposed instructions on the lesser-included crimes of "assault [as opposed to "malicious assault"] upon a governmental representative" and "battery of a governmental representative." The evidence shows that petitioner

4

maliciously used the water in the creek as a weapon to attempt to kill the trooper by drowning him, during which petitioner caused bodily injury to the trooper. Thus, petitioner's actions went beyond the assault or battery of a governmental representative to malicious assault of a governmental representative. That the trooper received only minor injuries is irrelevant to the *Wilkerson* analysis.[2] West Virginia Code § 61-2-l0b(b) does not require that the governmental representative's injuries be severe and, instead, requires only that the victim sustain a "bodily injury."

Petitioner's second assignment of error is that the circuit court erred in allowing the jury to consider "malice." Malice is an element of both attempted first-degree murder and malicious assault. First-degree murder requires the specific intent to take a life. *See State v. Hertzog*, 55 W. Va. 74, 81, 46 S.E. 792, 795 (1904) ("where murder is divided by statute into two degrees, and, to constitute it in the first degree, there must be the specific intent to take life"). Thus, for the jury to convict petitioner of attempted first-degree murder, the State had to prove he intended to take the trooper's life. Petitioner maintains that the evidence adduced at trial did not support an inference of malice. Petitioner claims he did not try to drown the trooper, but sought only to flee a possible arrest. Petitioner asserts the entire event lasted only thirty seconds and when the trooper stabbed him, he let the trooper go. Petitioner notes that, at that juncture, he could have attacked the trooper, but instead he fled the scene. Based on these assertions, petitioner opines that his actions did not evince a malicious intent to kill the trooper and, therefore, the circuit court erred in denying his attempted second-degree murder instruction.

With regard to petitioner's attempted first-degree murder charge, the trial court instructed that jury that

> [m]alice appears when the circumstances show such a reckless disregard for human life as necessary to include . . . a formed design against the life of a person assaulted or intended to be killed. Malice is defined as an act flowing from a wicked and corrupt motive, a thing done with wrongful intent, under any circumstances . . . the plain indication of a heart heedless of social duty and fatally bent on mischief.

> It is not essential that malice exist for any length of time before the act. It is sufficient if malice springs into the mind before the accused did the act alleged to be malicious.

This instruction comports with the law. *See State v. Saunders*, 108 W. Va. 148, 150 S.E. 519 (1929); *State v. Bongalis*, 180 W. Va. 584, 378 S.E.2d 449 (1989); Syl. Pt. 2, *State v. Slonaker*, 167 W. Va. 97, 280 S.E.2d 212 (1981) ("A jury instruction about malice should be, that it is not essential that malice should have existed for any length of time before the killing, but it is sufficient if malice springs into the mind before the accused did the killing."). Moreover, petitioner did not object to this instruction; thus, he has waived the argument that the circuit court erred in instructing the jury on "malice."

---

[2] The trooper's injuries included a closed head injury, head and neck pain, and lacerations, abrasions, and bruises on his arms and legs.

As a general rule, proceedings of trial courts are presumed to be regular, unless the contrary affirmatively appears upon the record, and errors assigned for the first time in an appellate court will not be regarded in any matter of which the trial court had jurisdiction or which might have been remedied in the trial court if objected to there.

Syl. Pt. 17, *State v. Thomas*, 157 W. Va. 640, 203 S.E.2d 445 (1974). However, even if petitioner has not waived the objection, we find the circuit court did not err in allowing the jury to consider "malice" because malice is an essential element of first-degree murder and petitioner was charged with attempted first-degree murder. *See* Syl. Pt. 4, *State ex rel. Combs v. Boles*, 151 W. Va. 194, 151 S.E.2d 115 (1966) ("'Malice express or implied is an essential element of murder of the first or second degree.' Point 1, Syllabus, *State v. Bowyer*, 143 W. Va. 302 [101 S.E.2d 243 (1957)]."). In fact, in his opening statement, petitioner's counsel told the jury that the State was going to have to show malice. Further, on appeal, petitioner admitted that malice was a "crucial issue in this case" because it was pertinent to both of his felony charges.

We also reject petitioner's argument that the circuit court erred in allowing the jury to consider malice with regard to the malicious assault upon a governmental representative charge. Petitioner claims that his interaction with the trooper was more akin to a "heat of passion" event than a malicious assault and resulted in only superficial injuries. However, malice is clearly an element of the malicious assault upon a governmental representative charge and, as noted above, petitioner admitted that malice was an issue at trial. With regard to both malice felonies, if petitioner was simply trying to flee arrest as he claims, he would have used only the force necessary to break free of the trooper and then run away. As the facts clearly show, petitioner did not do so and, instead, repeatedly attempted to drown the trooper, causing the trooper bodily injury.

Petitioner's third assignment of error is that the circuit court erred in denying his pretrial motion for a jury view of the crime scene. In response to that motion, the State argued that the scene had changed substantially since the event occurred some fourteen months before. Specifically, the State noted that some of the buildings at the scene had been torn down and new buildings had been erected. The circuit court denied petitioner's motion, as follows:

I still don't see the benefit then of a jury view. I think Mr. Austin [the witness who assisted the trooper at the scene] will be able to describe it and any other witnesses that were involved or saw what took place will be able to provide a description to the jury. And I fear that particularly in light of the heavy rains that we have received last night, Mill Creek - the level at Mill Creek may be higher now than it normally is, it may be lower now than it was in March [of 2016, when the incident occurred]. I'm concerned that if we were to take a view today, it could possibly misrepresent the situation as it existed at the time [of the underlying incident] and it could be confusing to the jury.

The court also found that the benefit of a jury view did not outweigh the time constraints and logistical difficulties in getting the jury to scene. However, the court allowed the State to enter an enlarged GPS photographic blowup of the scene.

Petitioner argues that a jury view of the crime scene was imperative given the seriousness of the alleged crimes, and so the jury could get a sense of the depth of the water in the creek. Petitioner highlights that there was conflicting testimony about the depth of the water at the time of his alleged crimes and, therefore, a view of the scene would have "enable[d] the jury to arrive at a better conclusion." Petitioner maintains that the circuit court could have instructed the jury that the scene might have changed. Finally, petitioner avers that the State's use of a GPS photographic blowup of the scene failed to provide a present sense impression of the depth of the creek. Therefore, petitioner concludes that the circuit court erred in allowing the State to use the blowup at trial in lieu of an actual view of the scene.

> "The allowance of a view by a jury is within the discretion of the trial court, and its refusal is not ground for reversal unless it is clearly manifest that a view was necessary to a just decision, and that the refusal operated to the injury of the party asking it." Point 4, Syllabus, *Compton v. The County Court of Marshall County*, 83 W.Va. 745 [99 S.E. 85 (1919)].

Syl. Pt. 4, *Daugherty v. Baltimore & Ohio R.R. Co.*, 135 W. Va. 688, 64 S.E.2d 231 (1951).

> Where in the trial of any case it appears to the court that a view of the premises involved in the hearing would enable the jury to arrive at a better conclusion, or would better inform it as to actual conditions, it is proper for the court to allow such view.

Syl. Pt. 2, *State v. McCausland*, 82 W. Va. 525, 96 S.E. 938 (1918). "'A motion for a jury view lies peculiarly within the discretion of the trial court, and, unless the denial of such view works probable injury to the moving party, the ruling will not be disturbed.' Syl. Pt. 1, *Collar v. McMullin*, 107 W. Va. 440, 148 S.E. 496 (1929)." Syl. Pt. 2, *State v. Ervin*, 238 W. Va. 77, 792 S.E.2d 309 (2016).

Petitioner argues that a jury view was necessary to let the jury see the depth of the creek where the alleged crime occurred. However, the best evidence regarding the depth of the creek at the time of the incident was through the trial testimony of those who were there. For example, the trooper testified that, at the time of the incident, the creek was about eighteen inches deep with a swift current. Mr. Austin, who came to the trooper's aid, testified that the incident occurred in "one of the deepest parts of . . . that area" and "[t]he current was really strong" such that it almost knocked Mr. Austin off his feet. If a view of the scene had occurred, there would have been no way of knowing if the conditions at the time of the view mirrored those at the time of the incident. As to the GPS photographic blowup, the trial transcript reveals that the State did not use it to establish the depth of water in the creek, but instead used the GPS photographic blowup, along with live testimony, to show the "lay of the land" at the crime scene. Accordingly, the circuit court did not abuse its discretion in denying petitioner's motion for a jury view of the scene.

Petitioner next argues that the circuit court erred in refusing to give the jury the following "reverse *Miller* instruction":

The Court instructs the jury that if you find beyond a reasonable doubt that the

7

Defendant did cause physical harm in this matter and that the Defendant did not use a weapon in commission of the same, then you may infer from the lack of use of a weapon that the Defendant did not have malice with respect to his actions.

If based on this inference you do not find the Defendant acted with malice then you may not find the Defendant guilty of the offense of malicious wounding on a governmental representative or attempted murder.

The "*Miller* instruction" petitioner references is found in Syllabus Point 7 of *State v. Miller*, 197 W. Va. 588, 476 S.E.2d 535 (1996), and provides, in part, that "[i]n instructing a jury as to the inference of malice, a trial court must prohibit the jury from finding any inference of malice from the use of a deadly weapon until the jury is satisfied that the defendant did in fact use a deadly weapon." The circuit court denied petitioner's request for a "reverse *Miller* instruction" because the court "did not think the decision in *Miller* support[ed] the converse of the use of a weapon permitting the inference of malice."

On appeal, petitioner argues that his lack of use of a deadly weapon implies a lack of malice. Thus, he argues his "reverse *Miller* instruction" was proper because if *Miller* requires the presence of a weapon, it should follow in the reverse that the lack of a weapon alleviates the possibility of malice. Petitioner claims that the circuit court's failure to impose a reverse *Miller* analysis resulted in an unjust result because the circuit court failed to read case law together for a common purpose. In support, petitioner cites to *State v. Louk*, 237 W. Va. 200, 786 S.E.2d 219 (2016) (Davis, J., concurring), regarding an unjust result and the failure to read statutes together in a common purpose. *Id.* at 212-15, 786 S.E.2d at 231-34.

Syllabus Point 7 of *Miller* does not provide that a jury may infer that a criminal defendant did not act with malice where the defendant did not use a deadly weapon. Therefore, because petitioner's proposed instruction is an incorrect statement of the law, the circuit court did not err in denying petitioner's request for a "reverse *Miller* instruction." *See* Syl. Pt. 5, *State v. Satterfield*, 193 W. Va. 503, 457 S.E.2d 440 (1995) ("An instruction to the jury is proper if it is a correct statement of the law and if sufficient evidence has been offered at trial to support it.") (Citations omitted). Further, if this Court were to adopt petitioner's "reverse Miller instruction," a murderer who killed his or her victim with something other than a deadly weapon (such as the water used during petitioner's attack on the trooper) would be entitled to an inference that he or she did not act with malice. Accordingly, we reject this assignment of error.

In petitioner's fifth assignment of error, he argues that the circuit court erred in giving the jury instruction regarding "malicious assault upon a governmental representative" where the Legislature amended the relevant statute, West Virginia Code § 61-2-10(b), a year after petitioner's crime to include "[l]aw-enforcement officer" in the list of governmental representatives. Specifically, in March of 2016, when petitioner was charged with malicious assault upon a government representative under West Virginia Code § 61-2-10(b) (2010), that section did not include "law-enforcement officer" under the list of "[g]overnment representative[s]." However, during the 2017 legislative session, the Legislature passed HB 3018 that added "[l]aw-enforcement officer" to the list of "[g]overnment representative[s]." *See* W. Va. Code § 61-2-10b(a)(5) (2017). Accordingly, petitioner claims the State violated his due process rights because he was exposed ex

post facto to the 2017 bill passed between the time of his alleged crime and his trial.

The circuit court properly instructed the jury as follows regarding "malicious assault upon a governmental representative" in light of West Virginia Code § 61-2-10b(b) (2010) and § 61-2-10(a)(1) (2010):

> In Count 2 of this indictment . . . [Petitioner] is charged with the offense of malicious assault upon a government employee in violation of West Virginia [C]ode 61-2-10b(b) [2010]. Malicious assault upon a government representative is committed when any person maliciously shoots, stabs, cuts or wounds or by any means causes bodily injury with the intent to maim, disfigure, disable or kill a government representative acting in his or her official capacity and the person knew or had reason to know that the victim was acting in his official capacity.

> Therefore, in order to prove the commission of the malicious assault upon a government representative, the State of West Virginia must overcome the presumption of innocence and prove beyond a reasonable doubt each of the following elements: [Petitioner] on or about March 16, 2016, in Randolph County, West Virginia, did maliciously shoot, stab, cut or wound - or did by any means cause bodily injury to [the trooper] with the intent to maim, disfigure, disable or kill [the trooper] and at the time of the assault, [the trooper] was a government representative and that [the trooper] was then and there acting in his official capacity and that at the time of the assault [petitioner] knew or had reason to know that [the trooper] was acting in his official capacity.

> The Court instructs the jury that a government representative means any officer or employee of this state or a political subdivision thereof or a person with a contract with a state agency or a political subdivision thereof.

This Court has held that "[u]nder *ex post facto* principles of the United States and West Virginia Constitutions, a law passed after the commission of an offense which increases the punishment, lengthens the sentence or operates to the detriment of the accused, cannot be applied to him." Syl. Pt. 1, *State ex rel. Carper v. W. Va. Parole Bd.*, 203 W. Va. 583, 509 S.E.2d 864 (1998) (quoting Syl. Pt. 1, *Adkins v. Bordenkircher*, 164 W. Va. 292, 262 S.E.2d 885 (1980)). In instructing the jury on "malicious assault upon a governmental representative," the circuit court properly referred only to the statute in effect at that time of petitioner's crime, West Virginia Code § 61-2-10b(b) (2010). The court never mentioned the term "law-enforcement officer" found in West Virginia Code § 61-2-10b(a)(5) (2017). Accordingly, the circuit court did not retroactively apply the 2017 version of the statute as petitioner claims. Moreover, in denying petitioner's motion to set aside his conviction for "malicious assault upon a governmental representative," the circuit court found "[t]here's no indication that the addition of a law enforcement officer at a later time [in 2017] was done [by the Legislature] because [law enforcement officers] were excluded from the spirit of the law at the time it was enacted, and so I'm going to deny that request . . . ." We agree. Accordingly, we deny petitioner's ex post facto argument.

Petitioner's sixth and final assignment of error is that the circuit court erred in imposing

consecutive sentences for his convictions for attempted first-degree murder and malicious assault upon a governmental representative. Petitioner argues that a singular event, lasting no more than thirty seconds, led to his indictments for attempted murder and malicious assault. Petitioner also notes that at his sentencing hearing, his counsel argued that attempted first-degree murder and malicious assault are "essentially . . . similar type offenses" from the "same transaction or occurrence." Accordingly, petitioner's counsel asked the court to impose concurrent sentences; however, the court refused to do so. Petitioner highlights that the "[t]he Double Jeopardy Clause in Article III, Section 5 of the West Virginia Constitution . . . prohibits multiple punishments for the same offense." Syl. Pt. 1, in part, *Conner v. Griffith*, 160 W. Va. 680, 238 S.E.2d 529 (1977). We note that although petitioner claims the circuit court punished him multiple times for the same offense, he admits that the elements of attempted first-degree murder and malicious assault on a governmental representative are "somewhat different, but both involve malice."

The circuit court did not err in sentencing petitioner to consecutive terms for his felony convictions of attempted first-degree murder and malicious assault because those convictions do not violate any prohibition against double jeopardy. "A defendant may be convicted for both malicious assault and attempted murder in the first degree without violating the proscription against double jeopardy found within article III, section 5 of the West Virginia Constitution since the provisions for each offense require proof of an additional fact which the other does not." Syl. Pt. 2, *State v. George*, 185 W. Va. 539, 408 S.E.2d 291 (1991). A malicious assault charge requires proof of serious bodily injury; however, no such proof is required to obtain an attempted murder conviction. Conversely, to prove attempted murder, the State must prove premeditation or lying in wait with the specific intent to kill and an overt act towards the commission of the crime. No such proof is required for a malicious assault conviction. *See id.* at 543-44, 408 S.E.2d at 295-96. Accordingly, we find no violation of the prohibition against double jeopardy.

For the foregoing reasons, we affirm.

Affirmed.

**ISSUED:** June 7, 2019

**CONCURRED IN BY:**

Chief Justice Elizabeth D. Walker
Justice Margaret L. Workman
Justice Tim Armstead
Justice Evan H. Jenkins
Justice John A. Hutchison